**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**LAS VEGAS DIVISION**

| | |
|---|---|
| BRIAN SCIARA, Plaintiff, | ) CASE NO: 2:18-CV-01700-DJA |
| | ) CIVIL |
| vs. | ) Las Vegas, Nevada |
| STEPHEN CAMPBELL, | ) Thursday, September 5, 2019 |
| Defendant. | ) (10:05 a.m. to 11:09 a.m.) |

**HEARING RE: MOTION TO DISMISS COMPLAINT [5]**

**BEFORE THE HONORABLE DANIEL J. ALBREGTS,**
**UNITED STATES MAGISTRATE JUDGE**

**APPEARANCES:**

For Plaintiff: PATRICIA K. LUNDVALL, ESQ.
McDonald Carano Wilson
2300 W. Sahara Ave., Suite 1200
Las Vegas, NV 89102

For Defendant: BRYCE K. KUNIMOTO, ESQ.
RYAN SEMERAD, ESQ.
Holland & Hart
9555 Hillwood Drive, Second Floor
Las Vegas, NV 89134

Court Reporter: Recorded; Digital

Courtroom Administrator: Donna Smith

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**Las Vegas, Nevada; Thursday, September 5, 2019; 10:05 a.m.**

**(Call to Order)**

**THE CLERK:** Next matter on the calendar is United -- or excuse me -- Sciara versus Campbell; Case Number 18-cv-1700-DJA.

Counsel, starting with Plaintiffs' Counsel, please enter your appearances.

**MS. LUNDVALL:** Good morning, your Honor. Pat Lundvall, from McDonald Carano, here on behalf of a Plaintiff. His name is Brian Sciara.

**THE COURT:** Thank you, Ms. Lundvall. Good morning.

**MR. KUNIMOTO:** Good morning, your Honor. Bryce Kunimoto and Mr. Ryan Semerad on behalf of the Defendant, Stephen Campbell. And with us today is Mr. Stephen Campbell.

**THE COURT:** Good morning, everyone. Thank you.

We are here today on the Defendant's Motion to Dismiss the Plaintiff's complaint, which was Document Number Five.

The Plaintiff filed an opposition to that, which is Document Number Seven; and a reply was filed by the Defendants, which is Document Number 11.

You-all can be seated as well.

The parties have consented to proceed before the Magistrate. So the Court's determination on these motions will be the final determination, as opposed to a report and

recommendation.

The Court set this hearing because I wanted to hear argument from the parties regarding what obviously is a pretty important issue, which is the jurisdictional question; and whether this matter should be held in Federal Court, in Nevada.

So what I would like to do is to have the parties focus on that aspect of the Motion to Dismiss.

And so it's the Defendant's motion. And so I'll start with the Defendant. And say, to the Defendant, why hasn't the Plaintiff had enough ties to this jurisdiction for us -- for this Court to assert its jurisdiction and hear this matter?

I mean, I know you've argued that in the pleadings, but I want to flush out these arguments as to what the connections are and why you think that this matter should not be heard in this district.

**MR. KUNIMOTO:** Understood, your Honor.

Your Honor, may I approach the --

**THE COURT:** Whatever is comfortable for Counsel. If you'd like to do it at Counsel table or the podium, either one is fine with the Court.

**MR. KUNIMOTO:** Thank you, your Honor.

Your Honor, as argued in our motion, the Plaintiff bears the burden of establishing that this Court has jurisdiction over his claims.

Our position, your Honor, is that the Plaintiff has failed to meet that burden with regard to either general or specific jurisdiction.

Plaintiff argues that, because Campbell originated contacts with Nevada and contracts with Nevada residents for his own person gain, that he should be subject to personal jurisdiction in Nevada.

Here the complaint makes generalized allegations of contacts Mr. Campbell had with Nevada, all of which appear to be based on actions taken on behalf of Sprout Financial.

For example, in the complaint, paragraph 14 -- which it's the verified complaint, your Honor -- it says, "Sciara and Campbell divided their time between Nevada and Arizona."

However, whether by intentional design or not, this vague statement does not describe how each man split or divided their time in each state.

Moreover, your Honor, in the complaint -- the same paragraph 14 -- it says, "Both Campbell and Sciara work regularly with a sizable client, venued in Las Vegas, Nevada."

However, it is still unclear if Plaintiff is contending that Mr. Campbell met with these clients in Las Vegas or if the work for these Nevada clients were done outside of Nevada.

Regardless, Plaintiff's opposition does not dispute Mr. Campbell's declaration -- which is attached as Exhibit 1 to

the Motion to Dismiss -- which states that, over the past four years, as Mr. Campbell recalls, he only traveled to Las Vegas four to five times total to discuss Sprout Financial with anyone or to meet with a vendor.

Furthermore, in the complaint, paragraph 14, it argues, "Sprout Financial employed or contracted, as independent contractors; individuals, residing in California."

However, this allegation, your Honor, focuses on Sprout Financial's Nevada contacts, as opposed to Mr. Campbell's contacts with Nevada.

That same paragraph 14, in the verified complaint, also says -- or starts, "A weekly company meeting for Sprout Financial was held. And if Sciara was not present in Arizona, Campbell would reach out to Sciara in Nevada."

Campbell and Sciara would telephone and communicate electronically with each other multiple times a day. However, this demonstrates that the meetings regularly occurred in Arizona.

And in regard to the telephone or e-mail communications that Mr. Campbell had with the Plaintiff, the Ninth Circuit, in Picot -- and I'm referring to 780 F.3d, 1214 -- has held that jurisdictional analysis must focus on the Defendant's contacts with the forum state; not the Defendant's contacts with the resident of the forum.

In the opposition -- and I'm referring to

Mr. Sciara's declaration, which is attached as to Exhibit 1 -- it says, "Campbell arranged to use information from my Nevada-based merchant account and my employer's identification number, VIN, to apply and receive a merchant account for Sprout Financial."

This is the opposition, Exhibit 1, paragraph number three.

However, this shows, your Honor, the following. One, it demonstrates that Mr. Campbell acted on behalf of Sprout Financial LLC -- which is specifically referenced in that attachment.

And it also shows that Sprout Financial LLC may have used a merchant account, but there is nothing in Exhibit 1 that shows this was based in Nevada.

Furthermore, the Plaintiff's opposition asserts arguments not supported by the allegations contained in the verified complaint.

For example, in the opposition, at the bottom of page 1, at the top of page 2, it says, "Sciara's verified complaint demonstrates that Sciara and Campbell, beginning when both lived in Nevada, developed a legally cognizable, confidential relationship and ultimately a business partnership, which resulted in many companies being jointly formed."

However, this is incorrect, your Honor. The complaint says only that their friendship began in Las Vegas,

as opposed to their business relationship.

Specifically, the complaint, on pages -- at the bottom of page 1, top of page 2 -- says, "Sciara and Campbell have been close personal friends for over 17 years. Both are married with children, and are now living in different states."

When Sciara's and Campbell's relationship began, both resided in Nevada. It says nothing about their professional relationship, including their professional relationship with respect to Sprout Financial, whether it's the LLC or the partnership, as contended by the Plaintiff -- that that started in Nevada.

The verified complaint contains general allegations about Mr. Campbell's contacts with Nevada. But it lacks any specificity.

On the other hand, Mr. Campbell's declaration, which is Exhibit 1 to the Motion to Dismiss, goes into specific detail about his Nevada contacts or lack thereof, and even goes so far to provide exact dates.

These statements are not refuted in Mr. Sciara's declaration attached to his opposition.

Further, Plaintiff's complaint seeks damages based on Mr. Sciara's claimed ownership interest in Sprout Financial, or that he was locked out.

But Campbell's detailed declaration identifies where these negotiations -- which were never finalized or agreed to -

- took place. In fact, all of these negotiations took place physically in Arizona or on the telephone.

Plaintiff's opposition does not dispute this.

For example, your Honor, Mr. Campbell's declaration -- and I'm referring to paragraph number 7.

It says, "In 2014, while in Phoenix, Arizona, with me, Mr. Gary Jefferson, CFO of MiCamp, and Mr. Micah Kinsler, president, Mr. Sciara proposed either selling his CapFund financial business or continuing that business jointly with me and Mr. Kinsler."

This statement is not disputed in the opposition.

Furthermore, in paragraph 8 of that same declaration, from Mr. Campbell -- attached as Exhibit 1 to the Motion to Dismiss -- it says, "Over a short period of time, an ownership interest of 20 percent in the Sprout business was discussed."

That paragraph, later on, goes on to say, "Nearly all of these discussions took place, in person, at 6930 Chauncey Lane, Phoenix, Arizona 85054.

"Only a small percentage of these discussions took place over the phone while Mr. Sciara was in Las Vegas and I was in Phoenix."

Again, this statement is also not disputed.

Paragraph 11 of Mr. Campbell's declaration states, "In May 2016, I took a call in Phoenix, Arizona from Mr. Sciara. He told me he wanted to merge CapFund with Sprout

Financial."

Again, the opposition does not dispute this statement.

Moreover, in paragraph 13 of the declaration, Mr. Campbell states that, "Mr. Sciara flew to Arizona, on April 27, 2018. And he and I played golf at the Dove Valley Ranch Golf Club."

The paragraph later goes on to say, "I ultimately propose that Mr. Sciara have a 20 percent equity interest in Sprout Financial." Subsequently, it says, "Mr. Sciara did not accept that proposal."

Again, that statement is also not refuted or opposed in the opposition.

But also, in regard to these limited Nevada contacts -- which are not disputed in the opposition -- the Plaintiff does not show how any of his claims arise out of or related to Mr. Campbell's limited forum -- Nevada forum contacts.

For example, paragraph 12 of Campbell's declaration says, "On April 5, 2018, I went to Las Vegas for purposes unrelated to Sprout Financial. Mr. Sciara and I met briefly then, but did not continue discussions regarding either Sprout Financial or owning a business together at that time."

That statement is not disputed.

And, moreover, the Plaintiff's claims -- which are

essentially that he is claiming an ownership interest in Sprout Financial, whether it's the LLC or the partnership -- Plaintiffs claims that he was locked out of Sprout Financial.

This contact that Mr. Campbell had, on April 5, 2018 -- the claims do not arise out of or relate to that meeting.

Moreover, in paragraph 21, Mr. Campbell stated, in his declaration -- over the past four years, Campbell doesn't recall more than four to five times, total, traveling to Las Vegas to discuss Sprout Financial with someone or with anyone or to meet with the vendor.

Again, the Plaintiff's claims do not arise out of or relate to these Nevada meetings. Rather, Plaintiff's claims are based on being denied an ownership interest and being locked out of the company.

In other words, Mr. Campbell's travels to Nevada for Sprout Financial business do not relate to the conduct at issue in this litigation.

Namely, the formation of Sprout Financial, which took place solely in Arizona; the equity interest in Sprout Financial, which is an Arizona-based company; the day-to-day operations of Sprout Financial, which took and take place in Arizona; Campbell's alleged refusal to provide certain financial information about Sprout Financial to Mr. Sciara, which also took place in Arizona; and Mr. Campbell's alleged

locking Sciara out of Sprout Financial, which also took place in Arizona.

Lastly, it appears that Plaintiff's characterization of Sprout Financial as being a partnership -- as opposed to a limited liability company -- is an attempt to circumvent to fiduciary show doctrine, which prevents the Court from exercising personal jurisdiction over an officer who has contact with the forum state solely because of his role as a fiduciary of the corporation.

And that is to Digitone Industrial Company versus Phoenix Accessories, Inc. It's a Westlaw case, from 2008; 2458194, pinpoint cite, asterisk, number 6; District of Nevada, June 13, 2018.

We raise this issue because we are concerned that, in the event that this Court were to deny this motion, that in the future, the Plaintiff does not take an inconsistent position by focusing on Sprout Financial, the limited liability corporation or the LLC.

Thank you, your Honor.

**THE COURT:** Thank you.

Ms. Lundvall?

**MS. LUNDVALL:** Thank you, your Honor.

First and foremost, let me say congratulations on your appointment.

**THE COURT:** Thank you.

**MS. LUNDVALL:** And also to express my thanks for holding this hearing so very promptly, then, after that appointment.

I thought that, possibly, it may be helpful to have -- for the Court to have a little bit of procedural history that led up to this motion; and then what has happened since the filing of the motion.

We filed our verified complaint on September 5th of 2018. And I understand -- underscore the fact that it was a verified complaint.

That complaint -- all of the factual allegations contained a verification by Mr. Sciara, stating that those factual assertions contained within there were true and correct. It has the same value, it has the same effect as either an affidavit or a declaration.

And I underscore that because the written opposition to this -- or the written Motion to Dismiss took the position that we were merely relying upon unverified factual assertions contained in the complaint.

The complaint was verified when we started that from the very beginning.

On October 3rd, the Motion to Dismiss was filed, and it was -- but it was not filed by the current law firm that is representing Mr. Campbell and the hearing today.

The law firm that filed the Motion to Dismiss came as

a bit of a surprise to Mr. Sciara. Why? Because it was the same law firm that had represented him and his Nevada company in a piece of litigation. And that same law firm had been selected by Mr. Campbell for Mr. Sciara.

And so when we pointed these pieces of information out to that former law firm, they then withdrew, and current Counsel then substituted in.

On November 2nd of 2018, there was a Motion to Stay that was filed by Mr. Campbell. And the Motion to Stay sought to stay discovery in all proceedings in this case during dependency of the Motion to Dismiss.

And as the Court has probably learned by now, that when you get a Motion to Stay -- that it requires then, if, in fact, that the Magistrate's been assigned to resolve that Motion to Stay -- to take a peek at the Motion to Dismiss and to look at the merits then of the Motion to Dismiss because that's one of the factors in determining the appropriateness of the Motion to Stay.

Judge Hoffman denied that Motion to Stay. And in denying that Motion to Stay, he stated this:

"Sciara's verified complaint contains detailed allegations of Campbell's contacts with Nevada; not just Sprout Financial's contacts. So the Court is not convinced the Motion to Dismiss will be granted."

In that same order, Judge Hoffman issued a scheduling

order that has largely dictated, then, the discovery schedule in this case.

As we were nearing the close of discovery -- which was in March of 2019, the parties agreed then to a mediation process. And that mediation process then was conducted by Judge Hoffman.

There were certain disputes that arose by reason of that. A mediation process and Judge Hoffman resolved those.

We had a follow-on mediation then in July of this year, after they had the benefit, then, of expert discovery.

Part of the reason I raise this is because, throughout the entirety of the discovery process and throughout the entirety of the mediation process -- which also included expert discovery.

Mr. Campbell came here to the jurisdiction. And when required, Mr. Sciara went to Arizona then to get the necessary evidence that he needed.

There was no complaint then, by Mr. Campbell, that somehow -- that he was unable to gather the necessary evidence by which to defend against this case or that it was a hardship upon him.

So the first thing I'd like to do, in addressing specifically the Motion to Dismiss on the personal jurisdiction grounds, is to give the Court just a basic legal framework.

Since this is a diversity case, you look to Nevada

law to see what Nevada's juris -- you know, a law is, *vis-a-vis* personal jurisdiction, then, over a Defendant.

Nevada law is really pretty simple. It's a simple statute that's found at NRS 14.06. And it allows for any jurisdiction that is accord with the U.S. Constitution.

So, in other words, Nevada defaults then to Federal case law, in large part, in determining the appropriateness of personal jurisdiction.

And the cases that we cited in our opposition and in the cases that I intend to reference during argument, then, are Federal cases.

The principal case that we relied upon in our opposition is a case that -- I'm going to date myself right now. It just came out when I was in law school, and we studied it in law school.

And if the -- I'm going to predict that the Court came after me in law school, but you may have learned about it in your casebook as well.

And it was the case of Burger King versus Rudzewicz. And the case of Burger King versus Rudzewicz was also a diversity case, and it involved partners in a commercial venture. And the U.S. Supreme Court called the case a divorce proceeding among commercial partners.

And then it went on to give a framework. And I think that some of this framework is a helpful tool, because it

addresses, very specifically, some of the arguments that were made both in the motion as well as in the reply.

And the one in particular agreement that they seemed to focus on, is that, somehow, that Mr. Campbell cannot have personal jurisdiction by this Court asserted over him because it was only a contact with Mr. Sciara; not a contact with the forum state.

That's not what the case law says. That is expressly not what Burger King says. And Burger King is cited in almost all of the Courts -- the U.S. Supreme Court's subsequent case, and is also cited by the Ninth Circuit from an analytical perspective.

And so that's why, then, I'm going to give the Court a couple quotes that demonstrate that the assertion. The legal assertion that was being made by Counsel for Mr. Campbell is not a legal assertion found in the law.

On page 472 of that decision -- and I quote, where a forum seeks to assert specific jurisdiction over an out-of-state Defendant who has not consented to suit here, the fair warning requirement is satisfied if the Defendant has purposely directed his activities at residents of the forum.

What have we alleged? Mr. Campbell purposely directed his activities at Mr. Sciara, who is a resident of the forum.

They go on to say that the -- and as long as the

litigation results from the injuries that were sustained by the resident, then there is a connection; there is an arising out of or related-to component of both the contacts that the Defendant had with the resident of the forum -- in this case, Mr. Sciara -- and the injuries that Mr. Sciara has sustained in this forum.

If you turn -- and I'm going to kind of jumpstart a little bit to this. Because there's a lot in Burger King that I can quote from.

But, on page 476, the Court summarizes, basically, all of its analysis.

And it speaks to the fact that, when a Defendant himself has created the substantial connection with the forum state and has created continuing obligations between himself and residents of the forum, then it's appropriate to assert personal jurisdiction over that Defendant.

And what have we alleged in this case is that Mr. Campbell had contacts with a Nevada resident. He created continuing obligations with that Nevada resident. And this litigation comes as a result of breach of those continuing obligations that he had to the Nevada resident.

When you look at the cases that were cited by Defense Counsel, there was one in particular that they relied upon. And that is the Picot, P-i-c-o-t, case. And that case was discussed in great detail then in a decision that was authored

by Judge Dawson.

And I direct the Court, in particular, to this decision because it's a helpful tool in looking at what evidence that the Court may look at in resolving this motion.

And the case I'm making reference to is the JGSM Entertainment case that we cited in our reply brief.

And, particularly, Judge Dawson outlined, then, what evidence is before the Court and what you can look at in trying to make a determination on personal jurisdiction.

To begin, it identifies that Mr. Campbell had a right, if he so chose to exercise it -- but he did not -- to request an evidentiary hearing by this Court early on to make a conclusive determination if, in fact, that there is personal jurisdiction.

And such evidentiary hearings are typically conducted when there's a dispute between the parties concerning the contact, the allegations, what evidence that there may be.

But when a party does not request an evidentiary hearing, then what the Court is required to do is to look at the allegations in the complaint –- and, in our circumstance, they're verified allegations -- as well as any other evidence that has been offered by the Plaintiff, plus the reasonable inferences that are drawn from those allegations and those assertion, and assume them to be true.

And then to look at those allegations, those

statements, those assertions, without regard to the competing evidence that has been offered by Mr. Campbell.

Why? Because there's no way for the Court to resolve the credibility determinations on paper. The only way you can do that is from an evidentiary hearing where you can make assessments then as to who is being candid with the Court and who is not.

And then as a result of looking at the verified allegations of the complaint, the declaration that was offered by Mr. Sciara, then you can look at and identify if he has made merely a *prima facie* showing.

And with all due respect, I believe that we have made more than our *prima facie* showing in the facts, then, that are before the Court.

Let me identify and articulate, then, what that showing has been to both of their implied allegations of the complaint, the assertions contained in the declaration that was offered by Mr. Sciara, as well as the reasonable inferences that derive from those.

But before that, based upon argument from Counsel, I think it's a helpful tool to look at our case in total, because there seems to have been a focus, from the Defense standpoint, on only one aspect of our case.

One aspect of our case -- no different than Burger King -- is that there is a divorce between commercial partners.

All right? That's one aspect of our case.

The second aspect of our case is the breach of confidential relationship claim. And let me describe that claim a little bit.

The granddaddy of that claim and what started and affirmed that claim was a decision from the Nevada Supreme Court, in Perry versus Jordan.

And in that case, the Nevada Supreme Court identified that there are breach of fiduciary duty claims where the Court automatically assumes that one party owes a fiduciary duty to another.

For example, attorneys owe fiduciary duties to their clients; certain trustees with banking institutions owe fiduciary duties. And the law recognizes those.

The Nevada Supreme Court recognized that a confidential relationship, if demonstrated, proves as the predicate for a breach of fiduciary duty claim. And that was the claim in Perry versus Jordan.

Remarkably, the facts in Perry versus Jordan are very similar to the facts in this case.

In Perry versus Jordan, there were two friends. They had a friendship to begin with. That friendship then evolved into one friend giving business advice to another friend, knowing that the friend was relying upon that business advice.

And then encouraging the friend to take certain

business actions that ultimately served to her detriment and to the benefit of the friend who was giving the advice.

And so, in this circumstance, we have alleged and asserted a breach of confidential relationship claim.

These men have been friends for going on 18 years now. Or at least at the time of filing the complaint, they were friends and had a long-term friendship that began here in the State of Nevada.

And that friendship was one -- as we have asserted in the verified complaint -- was where Mr. Sciara looked to Mr. Campbell for business advice, business ideas, and looked to him as a mentor.

That confidential relationship began in Nevada. And that's uncontributed.

Then Mr. Sciara had a business. Nevada -- Mr. Sciara, a Nevada resident, had a Nevada business that -- his principal place of business was here in the State of Nevada.

And just like in Burger King, the location, the foundation, the core of that business was here in Nevada. And the name of his company was CapFund Financial.

And Mr. Sciara was enjoying financial success, with that Nevada company, here in Nevada. It was an asset that he owned; it was an asset that he had developed; he had trade secrets associated with that asset; he was earning an income to

be able to feed his family based upon his exercise of business opportunities, here in Nevada, with that Nevada-based company.

So what happened? Mr. Campbell learned of the success of that company. Where did he learn of that success? Here in Nevada.

And he started asking questions and making inquiries about it, and started learning about the success that Mr. Sciara was enjoying with his company, CapFund Financial.

Generally, both these gentlemen refer to it as an industry of financial technology.

And so what happened from there is, as Mr. Campbell became more interested in the business, there began discussions, then, as to whether or not that there could be something that the two of them could put together jointly.

The negotiations then began between Mr. Sciara, here in Nevada; Mr. Campbell, when he would come to Nevada; and also with a third partner, Micah Kinsler, who was the -- there was a three -- three-man partnership then that started this in 2014, for this new venture.

Mr. Sciara has been able to identify a meeting here in Nevada at which the parties agreed then on the 40-40-20 split for that original partnership in 2014.

To start their new business, which they referred to as Sprout Financial, they had to acquire a merchant account. And as was set forth in the declaration by Mr. Sciara, that

merchant account was critical to the success of this new business venture.

And what -- it has been learned is that that merchant account, in essence, no different than -- it was described in Burger King. It acted as a barrier to injury into this financial technology market.

What they needed was this merchant account by which to accept revenue and to pay out revenue. They had to make an application then to acquire this merchant account.

So how -- what was the information that was found on this application? Mr. Campbell completed the application, signed it over his name.

But what did he use, to be able to get his entree to that merchant account? The Nevada company information; the identity of the Nevada company, the financial history of the Nevada company, the EIN of the Nevada company.

All of the information that the bank investigated to allow this new venture then to get a merchant account was based upon the historical information of this Nevada company that was owned by Mr. Sciara.

So let's move forward, then, a little bit in time, to continue talking about the contacts, then, that the two of them had with each other.

From 2014 to 2016, as this new venture was starting to come out of the ground, there were multiple conversations,

there were multiple meetings, there were multiple text messages, and there were multiple telephone calls.

They were meetings in Nevada, they were meetings in Arizona, there were locations where people would be on the phone in Nevada and others in Arizona.

There were times when, in fact, that Mr. Campbell would call Mr. Sciara; Mr. Sciara would call Mr. Campbell, in each of their respective states.

They sat at their desktops and they sent e-mail traffic back and forth, some into Arizona; some into Nevada. And this went on multiple times across the course of the day.

Just like the facts in Burger King, the parties may have been in two different states, but they developed a relationship with each other, such that it subjected them, the Defendant in Burger King, to personal jurisdiction, then, in the State of Florida.

Now, if you go on and you look at the additional allegations that were found in the verified complaint, and then the declaration, is that Mr. Campbell -- he would travel to Nevada to attend professional conferences that were related to the financial technology industry.

And he attended those conferences here in the State of Nevada. They worked on a sizable client together that was venued here in Nevada.

In other words, Mr. Campbell reached into Nevada and

he pulled Mr. Sciara into this venture, then, such that he was directing his activities into the State of Nevada at one of its residents.

Then the State of Nevada, then, has an interest in trying to protect one of its residents. And that was another factor that was identified in Burger King, so as to allow personal jurisdiction.

So 2014 to 2016, profits were shared from their partnership, 40, 40, and 20. Both partnership profits, then, were sent to Mr. Sciara here in the State of Nevada.

Now, during this period of time, Mr. Sciara had two duties. He was trying to get a new venture off the ground. And as part of that new venture, they were trying to develop a certain computerized programs to automate some of what they were doing.

At the same time, Mr. Sciara was also working his own company, CapFund Financial, which had its principal place of business here in the State of Nevada.

And, quite candidly, because the employee that Mr. Sciara had here in Nevada ultimately came -- became an employee then of the new venture and was venued here in Nevada -- because he was directing then all of his attentions then to this new venture -- it got to be a lot for Mr. Sciara. And at the same time, he was having his first baby.

There's what was a recognition, in 2016, that there

was a great deal of finance -- not financial -- but physical strain that was happening to Mr. Sciara by reason of basically having two businesses that he was trying to run, and run by himself.

And it was Mr. Campbell that suggested, "Why don't we merge, now, these two businesses?

"CapFund is enjoying great revenue, it is doing the same work that Sprout Financial is doing. "Merge your Nevada company into Sprout Financial and we'll increase your ownership interest.

"And in addition to increasing your ownership interest that will take you to a –- now, for our partnership, which is three people, rather than 40-40-20, it's now going to be 33-33-33, split between the three individuals. And we'll give you a guaranteed draw."

No different than I and my law firm. There's an expectation at the end of the year they'll be certain profits that I'll enjoy. By, then, January, February, March, I get a draw against those profits.

Mr. Sciara was earning and enjoying a draw against the profits, then, that the new venture was going to incur, after there was a merger.

Mr. Sciara, in Nevada, agreed to this merger. And so, from that perspective, then, what you look at is, effectively, at that point in time, Mr. Campbell had created

this situation whereby he had effectively stripped the Nevada-based company of all of its assets, all of its income flow, all of its trade secrets, and was now in this new venture, Sprout Financial.

You will also see, as far as in the verified complaint, that, in early 2018, that there was a dispute that arose between two of the partners, Mr. Campbell and another gentleman -- who we've taken his deposition and who confirms that there was a partnership agreement, and that it was -- began as a 40-40-20 split.

And then after the merger of the Nevada-based company into Sprout Financial, it became a partnership at 33-33-33 percent. He verified that, then, in the complaint -- or in his deposition.

But there was a dispute that arose between Mr. Campbell and this other partner. Mr. Campbell bought out the other partner.

And where did they celebrate? Where did Mr. Campbell celebrate the buyout of the other partner? Here in Nevada, with Mr. Sciara. And they began planning what the two of them were going to do then with Sprout Financial.

Mr. Sciara then got information from the former partner that, in fact, that Mr. Campbell may have designs on trying to squeeze him out of his partnership interest.

He also saw statements from attorneys, where there

was counseling being made to Mr. Campbell on the buyout then on Mr. Sciara's interest.

Mr. Sciara began asking questions, asking for information, asking for greater access to the accounts and the statements and the financial statements.

And at that point in time, Mr. Campbell locked him out. "No longer do you have access to any of our computer programs; no longer do you have access to all of -- on the clients that you had merged into us; no longer do you have access to the employees, to the lead source referrals," *et cetera*.

Locked him out, cut him off financially, said, "No more."

Mr. Sciara, when he describes what he looks at this case as -- he describes his Nevada-based company, CapFund, as like having a boat. And he was the owner of that boat. And he would drive that boat around.

And one day, he introduced that boat to his partner, Mr. Campbell. And they started driving around in the boat together.

And then one day, Mr. Campbell, when he was driving, took Mr. Sciara out in the middle of the ocean and dumped him overboard. Said, "My boat now."

That boat was a Nevada boat. That boat was a Nevada-based company. It had Nevada-based assets. And that boat,

then, was taken from Mr. Sciara.

And that's what this case is about.

And so, therefore, we believe that we have demonstrated -- not only did Mr. Campbell purposely direct contacts into the State of Nevada -- at its residents in the State of Nevada, but also that the claims that we have asserted against Mr. Campbell arise out of him reaching into the State of Nevada and the origin of his duty -- of his fiduciary duty to Mr. Sciara arose here in Nevada originally.

And we also believe, then, that the exercise of personal jurisdiction is both reasonable and fair under this circumstance. And, therefore, we would ask the Court, then, to deny their Motion to Dismiss based upon lack of personal jurisdiction.

I'm prepared to address the other arguments that were made, but I'm going to defer to the Court, then, as to if you wish for me to address those at this point.

**THE COURT:** Let me hear from Defense Counsel first.

I may have a couple other issues now that you brought up as it relates to the other Motion to Dismiss, I may want to hear from.

But I'd like to hear from Counsel first, in response to your arguments.

**MS. LUNDVALL:** Thank you, your Honor.

**THE COURT:** Yeah. Thank you.

And, Counsel, I heard -- it seems that the parties are in a bit of a disagreement about the standard to apply here. It seems that Plaintiff -- you know, when she outlined that because of the -- we don't have an evidentiary hearing, that the Court needs to look at the verified complaint.

And so if you could address that as well as the other things you want to address from her argument.

But the Court would like to hear your position as it relates to what standard I should be applying when I look at this question.

**MR. KUNIMOTO:** The standard in terms of jurisdiction on discovery or the standard in just assessing whether there are sufficient contacts for purposes of personal jurisdiction?

**THE COURT:** The latter.

**MR. KUNIMOTO:** Thank you, your Honor.

Your Honor, as we argued in our reply -- and I'm referring to page 6 of our reply, starting from line 14.

It says, "While the Ninth Circuit has previously held that a Defendant who individually targets a Plaintiff or engages in wrongful conduct targeted at a Plaintiff whom the Defendant knows to be a resident of the forum state" -- it should say, "That alone satisfies the express aiming requirement."

However, it has since been recognized that, in Walden, more is required. And I'm citing to the Axiom Foods

case, which is a 2017 case from the Ninth Circuit.

If we go to the prior page, which is on page 5 -- and I'm referring to line 6 -- contains a passage from the Walden case.

And it says, "Courts must examine two aspects of the Defendant's relationship with the forum state."

One, "Whether the relationship between the Defendant and the forum arose out of contacts -- the Defendant himself created with the forum" -- and that cites to the Burger King case that Plaintiff's Counsel alluded to earlier."

And, number two, "Whether the Defendant's contacts were with the forum itself; not persons who reside in the forum."

There are a lot of arguments about contacts that Mr. Campbell had with Mr. Sciara. As I mentioned earlier, most of those contacts -- in-person meetings, which give rise to or relate to the actual claims at issue -- occurred in Arizona.

Now, with respect to the telephone calls or e-mail communications that are alleged by -- or that was argued by Plaintiff's Counsel, the standard is that the jurisdictional analysis -- and I'm referring to the Picot case again -- the jurisdictional analysis must focus on the Defendant's contacts with the forum state; not the Defendant's contacts with the resident of the forum.

There are numerous arguments made about how

Mr. Campbell learned the success of Sciara's business in Nevada. That is nowhere to be found in the verified complaint; that is nowhere to be found in Mr. Sciara's declaration -- attached as Exhibit 1 to the opposition.

This is argument of Counsel -- which, if the case proceeds to trial, I'm sure Counsel will intend to argue before this Court. But there is no evidentiary basis presented in verified complaint or the opposition to support this statement.

There is also an argument, your Honor, that Mr. Campbell was stripping Sprout Financial of its assets.

Again, that's unsupported argument, which are -- which is not supported by the verified complaint or by Mr. Sciara's declaration.

And I have been trying to focus on what is currently pending before this Court, in the briefs, that -- in the briefing that was done by both parties.

**THE COURT:** Are you saying the Court is to rely -- it's your position the Court is to rely on the verified complaint and then the declarations attached to the pleadings in making this determination?

**MR. KUNIMOTO:** That is correct, your Honor.

There are certainly arguments that were made. But that's not part of the record before this Court; that's merely argument that, if this case goes to trial, I'm sure will be made.

There was an issue that -- about the merchant accounts. However, there are no claims that arise from or relate to the merchant accounts.

When I looked at the merchant account exhibit -- which is attached to Mr. Sciara's declaration in the opposition. And I believe that is --

**THE COURT:** The second exhibit, I think.

**MR. KUNIMOTO:** Yeah. It's on Document 7, page 24 of 26.

**THE COURT:** Right. The Court has it.

**MR. KUNIMOTO:** I don't see a reference to Nevada, other than it says, "CapFund Financial." But that doesn't even reference Nevada.

And, moreover, this is on behalf of Sprout Financial LLC. Many of the arguments, such as the profits from Sprout Financial were sent to Nevada by Sprout -- that is an action attributable to Sprout.

I want to focus on the actions that are specifically attributable to Mr. Stephen Campbell; not to the company.

Moreover, your Honor, with respect to jurisdictional discovery, I think this Court has a lot of discretion, is to -- as to make a decision as it deems appropriate.

But I just wanted to point out that a Plaintiff seeking jurisdictional discovery must provide some basis to believe that the discovery will lead to relevant evidence.

And District Courts may deny requests based on little more than a hunch that it might yield jurisdictionally relevant facts.

We didn't ask for jurisdictional discovery because, normally, that's a request made by the Plaintiff to uncover or determine what are the forum-related contacts by the Defendant.

We think the record is pretty clear. While there are general allegations contained in the verified complaint, Mr. Campbell provided a very detailed declaration which identified his contacts or lack thereof, and identified where the meetings took place, which -- and I don't necessarily want to repeat myself -- but those meetings occurred in Arizona or they occurred on the telephone.

There is nothing before this Court, in Mr. Sciara's declaration or in the verified complaint, that says that Mr. Sciara and Mr. Campbell had a meeting in Nevada to discuss, you know, the partnership. That's not what -- that's nowhere to be found.

So I think the focus should be on, to the extent that the claim is about him being locked out and him having an ownership interest. Where did those meetings actually take place?

And I have not seen anything in the record showing that there is a substantial connection or any connection between that buyout and the State of Nevada, your Honor.

**THE COURT:** Thank you.

**MR. KUNIMOTO:** Thank you.

**THE COURT:** I'm happy to hear a brief reply as to some of those arguments.

**MS. LUNDVALL:** Thank you, your Honor. One of the things that Counsel did, is he read from his brief when he was talking about the standard.

And he made reference to a decision called, "Walden versus Fiore."

Walden versus Fiore, I think is an important case to look at. Why? Because it was a case by an individual -- who happened to live in Nevada -- against a Georgia security guard.

The Nevada individual happened to be at an airport in Georgia. And the security guard, in Georgia, took certain actions against this person, unknowing that, in fact, that they were a Nevada resident. And the security guard took those actions in Georgia.

The security guard had absolutely no contact with the State of Nevada. His actions, his duties, his obligations, the scope in the course of his employment was all in the State of Georgia. And all actions by which, that gave rise, occurred in the State of Georgia.

And so, therefore, that's why that the U.S. Supreme Court identified that the resident forum has to have some connection to the bad acts; whether it be the resident, then,

resides there and that bad acts occurred in them -- in the State of Nevada.

But it can't be simply fortuitous because they've flown through every airport, then, across the United States, then, subjecting the TSA agents in all of those airports to jurisdiction in the State of Nevada.

It stands in stark contrast, then, to Burger King versus Rudzewicz; it stands in stark contrast, then, to the bomb case that was done by the U.S. Supreme Court; it stands in stark contrast, then, to the Bristol-Myers Squibb case, where what the Court was looking for is, what did that Defendant do in the State of Nevada.

And, in our circumstance, what this Defendant did, is he developed a continuing relationship with a resident of the State of Nevada.

That resident of the State of Nevada had a company that his principal place of business was Nevada. And he stole that Nevada company from him.

He stole the assets; he stole the trade secrets; he stole the clients; he stole all the know-how on how to operate that business.

That's what he did to the State of Nevada. And he did that, then, through the continuing relationship that he had with Mr. Sciara.

And, therefore, that's why it subjects him into

personal jurisdiction here in the State of Nevada.

**THE COURT:** All right. So I do want to hear one argument that was -- an issue in my mind came up as -- listening to your arguments as it relates to the Motion to Dismiss, under Rule 12(b)(6).

And I'd like to hear argument on the claim for the breach of the confidential relationship, and hear from the Defense about how you think the Plaintiff failed to plead specific facts supporting that –- that issue; that constructive fraud, basically.

If you could limit it to that issue, because the Court still has questions as it relates to that Motion to Dismiss on that issue. And I hope the parties are ready to argue that or, at least, discuss that issue today so I can flush that out as well.

**MR. KUNIMOTO:** Yes, your Honor.

Your Honor, in regard to the breach of the confidential relationship, a claim from the breach of a confidential relationship is a cause of action for constructive fraud.

And we cited to the Frudden versus Pilling; 842 F.Supp.2d 1265, pinpoint cite 1281, which is a District of Nevada case, from 2012 -- which, by the way, was reversed and remanded on other grounds.

Nevada Courts require a Plaintiff to plead

constructive fraud with Rule 9(b) particularity. And this is identified in the -- addressed in U-Haul Company versus Nevada, Inc. Case, 2011; U.S. District Court. It's a Lexis case, 72157, asterisk number 20.

Here in the complaint -- and I'm referring to paragraph 38 -- it provides no particularities, but barely says that a confidential relationship existed between Mr. Campbell and Mr. Sciara.

That is a conclusory statement. I understand that there's an allegation that they were childhood friends -- or they were friends and had a friendship, which started in Nevada.

But merely having a friendship that started in Nevada does not equate to having a confidential relationship, since, as you may have seen, in Mr. Campbell's declaration, in 2004, he moved to Arizona.

And then, subsequently, several years later, there were discussions that -- between Mr. Campbell and Mr. Sciara, which occurred in Arizona -- about him, you know, possibly being part of this organization and possibly having an ownership interest if the terms could be finalized.

There was no specificity in the complaint about when, exactly, it's alleged that this confidential relationship existed; how it was formed. There's no specificity.

And our argument, your Honor, is that, under the 9(b)

standard, there should be more. And for that reason, this claim should be dismissed.

**THE COURT:** Okay, Ms. Lundvall?

**MS. LUNDVALL:** Thank you, your Honor.

As I indicated, the granddaddy to the breach of confidential relationship claim, there's a case called Perry versus Jordan.

The most recent pronouncement on that very claim is a case involving the California Franchise Tax Board versus a gentleman by the name of, "Gilbert P. Hyatt."

That's my case. And it's a case that we have argued twice to the Nevada Supreme Court.

And, ultimately, in May of 2019, we got a decision from the U.S. Supreme Court that identified that the State of Nevada couldn't exercise jurisdiction over a California state agency.

But that's a case that went on for 20 years. And one of the claims that was at issue in that case was a breach of confidential relationship claim.

We briefed that, then, to the Nevada Supreme Court, and the Nevada Supreme Court identified what the parameters were to properly assert that claim.

And in drafting our verified complaint, we adhered to what those parameters were. And what those parameters do -- and I draft my complaint, I think, very similarly, to most

practitioners.

You have a whole series of general allegations. And then when you get to the specific counts, where you're identified in your legal theories, you incorporate by reference what all of that factual predicate is, into the essential elements of the claim that you're (indisc.).

And so when Counsel for Mr. Campbell says, "Well, all we did was do a naked allegation that there was a confidential relationship in the claim itself," what he does is he ignores the entire factual predicate, then, that we had asserted in the body of our complaint.

And what our Nevada Supreme Court has said you must do to assert a confidential relationship, is that you must assert that there was a relationship, whether in is social, a commercial relationship, as its foundation, and that the other knew of its reliance on the Defendant.

We asserted both of those allegations in our factual predicate when we identified the length of time that these gentlemen were first friends, and then evolved, then, into business partners, and that Mr. Sciara was looking to and relying upon Mr. Campbell as his business mentor.

We made those allegations. And if I could use the language, then, that, in fact, that Judge Mahan did in the Doe versus Mozer case.

In the Doe versus Mozer case, there was a Motion for

Summary Judgment. And in that Motion for Summary Judgment, Judge Mahan had identified -- did a termination of whether or not the factual allegations are enough to meet a confidential relationship.

Because it's such a factually intense relationship -- a factually intense allegation that those are issues of fact, then, that are appropriately determined, then, by a jury.

We set forth the facts that serve as a predicate, then, for that confidential relationship. And we identified the breach -- is that, when Mr. Campbell drove off with the boat; that when he left him out of all of the accounts after stripping his Nevada-based company, then, of all of its assets, its trade secrets, its clients, *et cetera*.

When he locked him out of that line of business, then, in fact, that's the breach of the confidential relationship.

And we've made those assertion, then, in our complaint, your Honor.

**THE COURT:** All right. Any reply to that?

**MR. KUNIMOTO:** Just --

**MS. LUNDVALL:** One last thing.

**THE COURT:** Okay.

**MS. LUNDVALL:** My apologies. And I --

**THE COURT:** No worries on that.

**MS. LUNDVALL:** I don't like to interrupt.

But I disagree with whether or not it needs to be plead to the 9(b) standard. Because knowing about a Supreme Court case is required then.

But even if you look at the 9(b) standard, the 9(b) standard requires you to identify the who, the what, the when, the where, and why.

And the factual detail in our complaint identifies the who, what was said, what was represented, what was done, where it was done, why it was done, and the harm that resulted from that.

And so we believe that we do meet the standards then -- the pleading standards of Rule 9(b).

Thank you, your Honor.

**THE COURT:** Thank you.

**MR. KUNIMOTO:** Your Honor, I'll make it very brief.

Plaintiff's Counsel referred to Mr. Campbell having locked Mr. Sciara out of the boat, with respect to CapFund.

CapFund is not a Plaintiff in this action. And as the record shows, in Mr. Campbell's declaration, the negotiations and discussion, with respect to CapFund, occurred, for example, in Arizona.

And I'm referring to paragraph 7, of Mr. Campbell's declaration, which says, "In 2014, while in Phoenix, Arizona with me, Mr. Gary Jefferson, CFO of MiCamp, and Mr. Micah Kinsler present, Mr. Sciara proposed either selling his CapFund

Financial business or continuing that business jointly with me and Mr. Kinsler.

"The opposition does not dispute that this meeting, where it was proposed by Mr. Sciara, to sell CapFund, occurred and took place in Arizona.

And, moreover, in paragraph 11 -- which also discusses CapFund -- it says, in 2006 -- sorry -- "In May of 2016, Mr. Campbell took a call in Phoenix, Arizona, from Mr. Sciara. "He told me he wanted to merge CapFund Financial with Sprout Financial."

So while CapFund Financial, a non-party to this case -- and there's accusations that he got -- Mr. Sciara was locked out of the boat, those discussions about merging CapFund with Sprout were initiated, in Arizona, by Mr. Sciara, or initiated with a telephone call, from Mr. Sciara, to Mr. Campbell, when Mr. Campbell was in Arizona.

Thank you, your Honor.

**THE COURT:** All right. Thank you very much.

In my short time on the bench, one of the things I've seen -- and it's a little disappointing -- is that, sometimes, the quality of lawyering and legal work in Federal Court isn't what one would expect.

That's not the case here. I appreciate your preparation, your arguments.

It's an interesting issue, early on in my career.

But I am going to take it under advisement. And a written order, we'll issue later.

I know you're all dying to know where I was when Burger King was decided. I was in my second year of law school, so I'm not as young as I look, unfortunately.

Is there anything further from the parties?

**MR. KUNIMOTO:** Nothing, your Honor. Thank you very much.

**MS. LUNDVALL:** Not today, your Honor.

**THE COURT:** Thank you very much. Court is in recess.

**(Proceedings Adjourned)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**February 17, 2020**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***